(No. 83-CC-2749-)

ROBERT EARLY and DIANE M. EARLY, Claimants, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 20, 1994.*

JOHN H. HENELY, LTD. (JOHN H. HENELY and JAMES A. SANTUCCI, of counsel), for Claimant.

ROLAND W. BURRIS, Attorney General (JOHN A. SIMON, Assistant Attorney General, of counsel), for Respondent.

OPINION

MITCHELL, J.

On Saturday, June 13, 1981, heavy rains hit the southwest suburban Chicago area, including northeastern Will County, causing flooding in areas of Joliet and the surrounding area. That afternoon, Claimants, Robert Early and Diane M. Early, husband and wife, traveled from their home in Minooka along Interstate 80 west to Morris, Illinois where a wedding and reception took place. Claimants admit that they did consume some alcohol at the reception, then joined a group at a lounge about 9 p.m. and did consume "a few drinks." At about midnight, they left to go home, a drive of approximately 20 to 25 minutes, and decided to use Illinois Route 6, which runs roughly parallel to Interstate 80, but is an older two-lane road and not a freeway.

On approaching the intersection of Route 6 and Sand Ridge Road, Claimants saw that the road ahead was covered with water from side to side for approximately 100 to 150 feet. Driver, Robert Early, applied the brakes to his car but was unable to stop before entering the water, which caused him to lose control of the vehicle. The vehicle skidded sideways along the right-hand shoulder until it struck a telephone pole. Robert Early suffered injuries, including broken ribs; Diane Early sustained multiple serious injuries which incapacitated her for six months and limited her activities for two years. Claimants seek restitution for their injuries from the State of Illinois, alleging that the signs placed upon the roadway to warn of the hazard were inadequate and failed to alert drivers of the danger from the standing water on the road.

The State testified, largely uncontradicted, that, upon notice from the sheriff's department at approxi-

mately 8:30 p.m. that evening, there was a problem with standing water on Route 6 near Sand Ridge Road, a trained highway maintenance operator, William Weaver, was dispatched to the scene where he removed two signs from an area of the same road which had had a similar problem from standing water earlier in the day, and moved those signs to the area under consideration here. Weaver, in accordance with procedures he had been taught, placed each sign 3/10ths of a mile (approximately 1,584 feet) from the edges of the water in each direction. The signs themselves bore the inscription "WATER ON PAVEMENT" in five-inch high black letters on a reflective yellow sign of 36-inch by 36-inch size. Those signs were attached to tripod-type folding stands which have spiked feet to allow the stand to be sunk into the ground to anchor it. Claimants contend that they saw no warning sign and that quite possibly the sign had been blown over by a stiff wind. Claimants' expert witness further testified that the sign should have been larger, 48 inches by 48 inches, and that only one sign per direction was inadequate—that two would have been better.

A. Whether sign was present. Sheriff's Deputy Dan Carey testified that, in investigating the accident scene, he had occasion to check to see if the warning signs were posted as had been ordered. He found that they were in place. There was no direct contradictory evidence. There was some indication in the testimony of Jeanette Erickson, a local resident who reported the accident to police, that she did not see any warning signs, but no directly contradictory testimony. It is the finding of the Court that the signs had been posted as per the instructions given by George Poppleton to William Weaver.

B. Size of the sign. Claimants' expert testified that he believed a 48-inch by 48-inch sign was called for under

the circumstances, the State's expert, who had a hand in the compilation of the relevant rules, stated that the then-current rules required only a 36-inch by 36-inch sign. A larger sign would have been visible at a greater distance, allowing a longer stopping time. Inasmuch as the Claimants argue that the distance from the sign to the hazard was excessive (see below), this argument does not carry much weight. Clearly it is more difficult to overlook a four-foot square sign than a three-foot square sign, but either size is adequate once the driver is within 200 feet of the sign, and, as stated above, the State did comply with the current rules.

C. Placement of the sign. Claimants further argue that the placement of the warning sign at a distance of 1,500 feet was too far from the hazard and likely to cause confusion since the driver might be looking for the hazard at a distance considerably closer to the warning sign. This argument appears to defy logic. If the driver sees a warning sign, "Water on pavement," the standard reaction ought to be to slow down, at least by removing the foot from the accelerator, if not immediately beginning the braking process. Fifteen hundred feet is designed to allow the vehicle to come to a reasonable deceleration from the posted speed limit, especially on wet pavement, without placing the vehicle's occupants in jeopardy. At the very least, the vehicle's speed approaching the hazard will be less for the driver having braked and been put on alert. We find no fault in the placement of the warning signs.

D. Number of signs. Claimants' expert, Robert Lippmann, made a very good argument for the use of two signs to warn of a hazard, borrowing from the construction industry's practice; further, he felt it would be better if the distance to the hazard were noted on each sign. These ideas obviously have merit. However, the construction in-

dustry can set up signs on a prolonged basis: a construction job can take months. A sign that warns of "construction ahead—400 feet," can be used on every job since it is nearly always possible to measure 400 feet from the point of activity. Here, the Respondent stated that use of these signs was rare and the distance placement was based on the type of road and the speed limit. Thus, the highway department would need detachable distance markers and extra equipment. As to the effect of a second warning device for those who missed the first ones, while that may be desirable, such a change of law or rule must come from the State legislature or appropriate State agency, not from the courts.

E. Condition of the sign. There was some testimony as to whether the actual sign used that night was in proper condition: whether it had ever had a reflective coating or whether that coating might have deteriorated from age and rough use. State's expert testified that all signs of that type are reflective and no evidence was presented which showed that the actual sign in use had lost its reflective coating.

Route 6 is the second most heavily traveled road in Grundy County and the road had water on it for some time prior to the placement of the signs at approximately 8:30 p.m. However, for at least three hours (9 p.m. to midnight), after-dark traffic traversing this busy road with a posted speed limit of 55 mph was able to see the warning signs, act accordingly by reducing speed, and navigate the water without incident. If only one car came through in either direction every two minutes, that would mean that close to 100 cars saw the warning sign and reacted safely to the situation. While there may have been further steps that the State of Illinois could have taken to reduce the chance of such an accident happening, we find that they acted responsibly under the circumstances.

We can sympathize with the pain and suffering that especially Diane Early has endured because of this accident. However, the State of Illinois did not create unreasonably dangerous conditions; it reacted in a reasonable manner and in accordance with departmental guidelines which were adequate for the multitude of vehicles which preceded Claimants down Route 6 that night. The claim is denied.